UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NAWAPORN PAWANANUN, | ) | CASE NO. 1:20CV1081 |
| | ) | |
| Petitioner, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | |
| | ) | |
| MICHAEL A. PETTIT, | ) | OPINION AND ORDER |
| | ) | |
| Respondent. | ) | |

**CHRISTOPHER A. BOYKO, J.:**

In this action under the Hague Convention, Petitioner Nawaporn Pawananun seeks the return of her two daughters who Respondent Michael Pettit removed from Thailand.  The parties agree that Respondent wrongfully removed their children from their habitual residence of Thailand.  But Respondent claims that the children would be exposed to a grave risk of harm or placed in an intolerable situation should they return to Thailand.  The question for the Court is whether an "equivocal case" of child abuse is enough to prevent the children's return to Thailand.  The Court holds no, and, for the following reasons, **GRANTS** Petitioner's Petition.

**I. BACKGROUND FACTS**

**A.    The Parties' Relationship**

Petitioner (a Thai citizen) and Respondent (an American citizen), met in Thailand in 2009.  Their relationship grew and they informally married in Thailand.  The couple formalized

- 1 -

their marriage in the United States in December of 2011.  For the first few years of their marriage, the two resided in Ohio.  In 2013, Petitioner gave birth to a daughter, M.P.

In 2014, the family of three relocated to Saraburi, Thailand.  Petitioner had family in the area and the opportunity to operate her uncle's wedding business.  The parties and their daughter moved into a residence with Petitioner's parents.  In 2015, Petitioner gave birth to a second daughter, Z.P.

Towards the end of 2016, the family relocated to Chiang Mai, Thailand.  The parties disagree as to the exact reason for the move, but it appears to have been at Respondent's insistence.  Petitioner continued her job as a wedding planner, which required frequent travel, mainly back to Saraburi.[1]  They enrolled M.P. in Tonkla School in Chiang Mai.  Z.P. joined her sister at the same school later.

In early March of 2019, Petitioner asked Respondent for a divorce.  Reluctant at first, Respondent ultimately agreed.  The parties amicably finalized their divorce in April of 2019. They agreed to joint custody of M.P. and Z.P.  They also agreed the children would continue to reside in Chiang Mai, Thailand until the age of eighteen.

**B.  Roger Ian Hardy**

A few months before their divorce, the parties met Dr. Roger Ian Hardy ("Hardy"), an American citizen living in Chiang Mai with his Thai wife (Umy) and their children, including H.H.  The Pettits and Hardys met at Tonkla School, where H.H. also attended.  As an American, Petitioner believed a friendship between Respondent and Hardy would be beneficial for Respondent, so the two initiated a friendship.  Together they ate breakfast, joined the same gym and watched the New England Patriots win their sixth Super Bowl in February of 2019.

---

[1] By car, Saraburi is eight to nine hours away.  By plane, the flight is less than one hour and costs between $15.00 to $30.00.

However, Respondent did not completely trust his new compatriot.  For one thing, Hardy (unprompted) discussed life back in the United States and the successful fertility practice he left behind.  With his interest piqued, Respondent searched the internet for Hardy.  The results reflected a series of articles pertaining to claims that Hardy sexually assaulted and improperly touched patients and staff while he was a doctor.  Respondent also learned that state investigations ensued.  Hardy ultimately surrendered his medical license and moved to Thailand.  Respondent also learned that Hardy had an injunction filed against him that forced him to stay away from the Prem School, another grade school in Thailand.

Troubled, Respondent shared this information with his wife.  Apparently, Petitioner had already known of these allegations, as Hardy told her and claimed the allegations to be "fake news."  Respondent classified Petitioner's response as "indifferent," even as he warned that the couple had to be vigilant around Hardy.  Nevertheless, the parties continued to socialize with Hardy.

Respondent had a second reason to be suspicious of Hardy—infidelity.  In April of 2019, Respondent messaged Hardy's wife Umy[2] informing her of his suspicion that Petitioner and Hardy were involved romantically.  Furthermore, after their divorce, Respondent learned that Hardy purchased a hotel room for Petitioner in Chiang Mai in February of 2019.  Both Petitioner and Hardy claimed that the purpose of the overnight stay was purely business—they wanted to explore Petitioner's options of moving her wedding business up to Chiang Mai from Saraburi.  Both testified that Hardy did not spend the night, but admitted they ate dinner together.  The next morning, Petitioner took a free shuttle from the hotel to the airport.  Once at the airport, she

---

[2] Hardy and Umy are going through their own divorce proceedings in Thailand.  Hardy alleged Umy was unfaithful during their relationship and named Umy's paramour as a second defendant.  In Thailand, there can be a monetary penalty for infidelity.

called Respondent for a ride.  Respondent did just that, none the wiser of Petitioner's stay at the hotel.  For her part, Petitioner denies any romantic relationship with Hardy.[3]

At some point, Respondent obtained a Report from the Massachusetts Board of Registration in Medicine that detailed the claims of abuse against Hardy.[4]  Respondent claimed that, while he shared this information with Petitioner before August of 2019,[5] Petitioner had no interest in the material.

## C.    August of 2019

The focal point of this case involves events that occurred in August of 2019.  On August 18, during his time with the children, Respondent claimed M.P. told him that "H.H.'s daddy (i.e., Hardy) touched us," referring to herself and her sister Z.P.  Z.P. then demonstrated that Hardy touched her inner thigh, towards her genitals.  M.P. also said that Hardy grabbed her by the arm and hurt her.  M.P. allegedly then shut down, not wanting to discuss the issue any further.

The next day, on August 19, Respondent spoke with Petitioner on the phone.[6]  For over fourteen minutes, Respondent discussed the option of schooling the children in the United States.

---

[3] Other evidence was introduced to suggest a romantic relationship between Petitioner and Hardy.  The two spoke frequently on the phone for great periods of time, sometimes after 9:00PM.  Both Hardy and Petitioner claimed the phone calls were to assist Hardy's children with their homework in Thai.  But Petitioner acknowledged that any calls after 9:00PM were just to talk with Hardy.  There were multiple pictures of the two in public.  Finally, in April of 2020, Petitioner vacationed with Hardy, his children and another family.  Petitioner and Hardy drove to the vacation rental and back together.  Again, Petitioner and Hardy insist that the vacation was purely platonic.

[4] Prior to Trial, Petitioner moved to exclude the introduction of this evidence at trial.  The Court granted the motion, but the Court reserved the right to revisit its ruling depending on how the evidence was presented.  (Doc. 66).  Both parties referred to the Report throughout the trial, but more for its existence and impact on Respondent, rather than impermissible character evidence of Hardy.  The Court will consider the Report for that limited purpose.

[5] Based on the Exhibit, it appears Respondent requested the information from the medical boards on September 26, 2019.  The Board responded to the public record request on October 3, 2019 with seventy pages of records.  On December 12, 2019, Respondent requested a certified copy to which the Board responded on December 13, 2019.

[6] Petitioner recorded this phone conversation.  According to Petitioner, she began recording her phone calls with Respondent before the divorce and a "little bit after [it.]"  The parties finalized their divorce in April of 2019.  Thus, it is clear Petitioner continued to record her phone conversations with Respondent well after their divorce.  The parties played four calls at Trial.  According to Petitioner, there were more, but she deleted them because she was not interested in them.

When Petitioner disagreed with the proposal, Respondent replied, "[w]ell, you know, there are other things that come into play, and I really need to say this…you need to keep [Hardy] away from our daughters.  I will take care of what I have to take care of…"

Before this statement, Respondent never mentioned Hardy nor what his daughters told him the day before.  Respondent testified that he did not tell Petitioner the allegations because she "did not believe anything about [Hardy], his background, his past," which concerned Respondent.  Therefore, Respondent thought it was best for him "to just handle it."  For her part, Petitioner had no idea why Respondent said that about Hardy.  According to Petitioner, the parties never talked about Hardy before this call.

A few days later, on August 22, Respondent left Thailand for the United States.[7]  He allegedly cut his trip short and returned to Thailand on August 26.  On August 29, Petitioner dropped the children off at Respondent's, earlier than scheduled.  Respondent claimed that, from the moment the children arrived, M.P. behaved unusually.

On August 30, M.P. had a write up in her daily report at school.  The report reflected that "M.P. got angry when her friend told the teacher that she [did] not finish her milk.  Then M.P. [was] not in a good mood and start[ed] to stomp her feet.  In [the] afternoon, she can adjust her mood and be better."  Respondent classified this incident as a "meltdown" that was inconsistent with M.P.'s normal demeanor.  As a result, Respondent continued to worry about M.P.

On August 31 (a Saturday), Respondent "found [M.P.] at the foot of [his] bed curled up in a fetal position[.]"  Through tears, M.P. said "something happened at mommy's house."  According to Respondent, M.P. told him that H.H.'s dad had grabbed her, hurt her, made her cry

---

[7] Per Respondent's visa requirements, he had to return to the United States every 90 days or risk punishment in Thailand.

and touched her leg or thigh again.  Emotional, Respondent recounted his next steps, which included comforting M.P. as she cried in his arms.  It was at this point that Respondent noticed "a bruise on the upper inside of [M.P.'s] right leg towards her…vagina[.]"

According to both Petitioner and Hardy, the bruise resulted when M.P. fell from a playhouse she climbed at Petitioner's home.[8]  The fall allegedly occurred sometime in August.  Petitioner testified that she carried M.P. from the playroom where M.P. fell into the living room.  Hardy testified that M.P. came running out after the fall.  Either way, someone grabbed ice and Hardy applied the ice to M.P.'s inner leg.  Both Petitioner and Hardy testified that no bruising occurred at the time, but that a bruise developed later.  At the time, Petitioner never told Respondent that M.P. fell from the playhouse.

**D.      September of 2019**

Respondent did not immediately discuss the August 31 revelation with Petitioner.  Instead, Respondent retained legal counsel to assist him with pursuing a child abuse investigation.  This pursuit resulted in the children visiting multiple doctors in Thailand.

The first appointment happened on September 4 with Dr. Anjana Sachabudhawong, the children's pediatrician.  Respondent and two of his lawyers attended this appointment with the children.  Petitioner was unaware of this appointment.  Per her report, Dr. Anjana noted the presence of an old bruise on M.P.'s inner thigh, very close to her private part, as well as a new bruise at the inner aspect of M.P.'s left knee.[9]

While not in her report, Dr. Anjana did schedule the children for a follow up appointment with a psychologist.  This is corroborated by the fact that Dr. Anjana's office called Petitioner to

---

[8] It is unclear when this explanation became known.  As discussed later, Petitioner never recounted this incident when the parties talked on the phone about the genesis of the bruise.

[9] Dr. Anjana also examined Z.P. and found nothing abnormal.

confirm the next appointment.  Unaware of the initial appointment and the reason behind it, Petitioner cancelled the follow-up appointment.

The next day, on September 5, Respondent called Petitioner.  During the conversation, Respondent informed Petitioner about the past couple days.  Respondent relayed that M.P. had been upset since the weekend, that something happened at Respondent's house and that M.P. was afraid of Hardy.  Because of this, Respondent took the children to Dr. Anjana for an examination.  According to Respondent, Dr. Anjana observed some personality concerns with M.P. and indicated that there was a chance of child abuse.  Again, this information is not contained in Dr. Anjana's report.

Given this information, Respondent questioned how Petitioner could provide a safe environment for the children, which included keeping Hardy away from the children.  Petitioner responded that the children are always in her sight when they are with her.  With respect to Hardy, Petitioner told Respondent that "he will have to do something" about Hardy being around the children.  Ultimately, Petitioner did not fully credit these allegations — the first she heard of them — and decided to follow up with Dr. Anjana.

Before Petitioner could meet with Dr. Anjana however, Respondent continued with his investigation.  On September 5, he took the children to a second appointment with Dr. Paitoon Narongchai, a forensic psychologist.  Again, Respondent, accompanied by two attorneys, attended the appointment.  In his report about M.P., Dr. Paitoon noted the following:[10]

| | |
|---|---|
| **Chief Complaint:** | Father has informed that new American partner of his ex-wife physically harmed the kid. |
| **Present Illness:** | Brown to Dark, Brown at medial side of Right thigh. |

---

[10] Dr. Paitoon also examined Z.P. and found no symptoms.  As for his diagnosis, Dr. Paitoon indicated "maybe [rule out] child abuse" and recommended Z.P. consult a psychiatrist.

- 7 -

| | |
|---|---|
| **Past history and family history detail:** | The kid was afraid when mentioned about the new husband of ex-wife of kid's father |
| **Diagnosis:** | Child Abuse |
| **Treatment/Suggestion:** | Consult psychiatrist |

With a diagnosis of child abuse, Respondent and his team of lawyers proceeded to the Mar Rim Police Station to file a police report.  The Police Report largely recounted the previously described events.  However, in his testimony, Respondent immediately casted doubt on the accuracy of the Police Report.  According to Respondent, the police did not accurately transcribe his statement and refused to correct it when requested.  He also alleged that the police shortened the Police Report, as well as omitted certain details.

The next day (September 6), Dr. Paitoon issued a supplemental report regarding M.P.[11]  It is unclear why Dr. Paitoon supplemented his report.  But in the supplemental report, he noted that the "father of the patient is afraid and curious that the patient was physically harmed by a new partner of wife or mother of the child patient while staying at the house of patient's mother."  As for his diagnosis, Dr. Paitoon "presume[d] that the child will be mentally attacked (Child abuse)."  Dr. Paitoon recommended informing Chiang Mai Provincial Social Development and Human Security Office.

Also on September 6, Petitioner met with Dr. Anjana.  Petitioner summarized her conversation with Dr. Anjana the next day during a phone call with Respondent.  According to Petitioner, Dr. Anjana did not have any abuse concerns for the children and both children's "private part was totally fine."  Petitioner repeated Dr. Anjana's speculation that the bruise could have resulted from gymnastics or horseback riding.  Petitioner did not mention M.P.'s fall from

---

[11] Dr. Paitoon issued a supplemental report concerning Z.P. as well.  It is largely the same as M.P.'s supplemental record, except the diagnosis reads: "Presume that the child possibly tends to be mentally or physically harmed in the future."

- 8 -

the playhouse as a possible cause.  Again, Petitioner was not concerned because the children were always in her sights.

In response, Respondent clarified that the issue was not one of sexual abuse, but rather general abuse.  And according to Respondent, Dr. Anjana said that the bruise could not have resulted from a fall or being hit, but rather from someone grabbing M.P.  Furthermore, Respondent claimed he spoke to Dr. Anjana after this and Dr. Anjana reiterated her concerns of abuse.

The final medical appointment came later in September at the government hospital.  Per the Medical Certificate of Dr. Buttabote Pruksapanachart, the doctor found that M.P. had a "history of emotional and behavioral change."  Dr. Buttabote also recorded that "M.P. informed that 'H.H.'s father touched on my leg and my sister's leg.'"  Dr. Buttabote did not find any psychiatric disorder present with M.P.[12]  Furthermore, there was no evidence of any penetration. As for further treatment, Dr. Buttabote did not find any abnormalities that required treatment and recommended to "monitor and observe" as proper.

E.     **Thai Custody Dispute**

The above events culminated in Respondent filing for sole custody in the Chiang Mai Juvenile and Family Court ("Custody Complaint").  In his Custody Complaint, Respondent alleged that Hardy, as Petitioner's boyfriend, harmed the children causing them mental anguish. When confronted, Respondent claimed Petitioner was indifferent and even prevented additional doctor appointments.  Petitioner denied the allegations and countersued for back support damages.

---

[12] Dr. Buttabote also examined Z.P. and his findings regarding Z.P. are similar to those of M.P.

On September 21, 2019, Respondent emailed Petitioner about the Custody Complaint and the visit to the government hospital.  Respondent summarized the visit and included that M.P. said she was instructed to not tell anyone by someone at Petitioner's house.  Respondent believed that M.P. would make further disclosures in future treatment sessions.  Based on this, Respondent feared that both M.P. and Z.P. would "be exposed to an unacceptable risk of harm if they are returned to Petitioner's care[.]"  Therefore, he desired to keep the children until the Thai Court decided the custody dispute.  In response, Petitioner contacted the police.  Respondent returned the children the next day.

Throughout the custody proceedings, the parties discussed mediation.  Eventually,[13] Respondent agreed to sign an agreement that required the parties to keep "dangerous people" away from the children.  However, the parties never signed such an agreement.

**F.      Respondent's Removal of the Children from Thailand**

Instead, Respondent left Thailand with the children on January 7, 2020.  Respondent claimed he left because Petitioner would not keep Hardy away from the children and he continued to have concerns about Hardy's involvement in the daughters' lives.

For six months, Petitioner had no contact with her children.  But Respondent would contact Petitioner.  For example, on February 10, 2020, Respondent informed Petitioner that the girls are healthy and did not wish to speak to Petitioner.  Per his message, he left because Hardy presented a threat to the children.  And even though Respondent asked Petitioner to keep Hardy away three separate times, Petitioner declined.  Respondent then asked Petitioner to demonstrate

---

[13] The parties dispute when this occurred.  Petitioner argues this acceptance came on January 6, 2020, the day before Respondent removed the children from Thailand.  Respondent relies on the context of the phone recording, where he states he has a New Year's or Christmas present for Petitioner, signifying that the conversation happened before December 25, 2019.

her love for girls—he demanded Petitioner drop her countersuit and agree to keep Hardy away from the girls.  In exchange, Respondent would drop his lawsuit for custody.

On February 13, 2020, the Thai Court held a hearing on Respondent's Custody Complaint.  While not present, Respondent was represented at the hearing.  Of note, Dr. Paitoon testified about his care of the children.  Dr. Paitoon testified that M.P. reported to him that the bruise resulted from a fall during playtime.  When she said this, Respondent said the bruise may have been caused by Hardy.  Respondent's attorney said the same.  Dr. Paitoon also observed Respondent speak "very intense[ly]" with M.P., causing M.P. to become worried, scared and cried.  Therefore, Dr. Paitoon testified that his diagnosis of child abuse resulted from the actions of Respondent, rather than Hardy.  On cross examination, Dr. Paitoon admitted that the above statements, including the cause of the bruise, were not specified in his report.

On March 16, 2020, in a written opinion, the Thai Court denied Respondent's claim for custody, granted sole custody to Petitioner and awarded Petitioner support costs.

Respondent contends that the children have adjusted well to their life in the United States.  Both children are in school.  At a time, both children were seeing a psychologist, Dr. Janet Davis.  However, after Petitioner's arrival in the United States for this trial, Petitioner withdrew her consent for the children's continued appointments with Dr. Davis.

## G.  Procedural History

On May 18, 2020, Petitioner filed her Petition for the return of her children to Thailand pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9003, et seq.  (Doc. 1).  On October 21 and 22, 2020, the Court held a Bench Trial.  Both Petitioner and Respondent testified in person.  Dr. Farshid Afsarifard testified in person on

Respondent's behalf as an expert.  The parties submitted the depositions of Hardy, Umy Hardy, Bruce Lasky (Respondent's attorney in Thailand) and Dr. Allessandro Stasi.

On November 17, 2020, the parties submitted Proposed Findings of Fact and Conclusions of Law.  (Docs. 74 & 75).

## II. LAW & ANALYSIS

### A.    Standard of Review

This Petition is brought under the Convention and ICARA.  The Convention, a treaty to which both the United States and Thailand are signatories, was adopted to respond to the problem of international child abductions during domestic disputes.  *Abbott v. Abbott*, 560 U.S. 1, 8 (2010).  Its stated purpose is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure the rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States."  Convention, art. 1, Oct. 25, 1980, T.I.A.S. No. 11,670; *Abbott*, 560 U.S. at 8.

This Court has jurisdiction over the allegations contained in Petitioner's Petition under 22 U.S.C. § 9003.  The Court's jurisdiction extends to a determination of "the merits of an abduction claim, but not the merits of the underlying custody dispute."  *Friedrich v. Friedrich*, 78 F.3d 1060, 1063 (6th Cir. 1996); Convention, art. 19; 22 U.S.C. § 9001(b)(4).  As the Convention is intended to deter parents crossing borders, *Friedrich*, 78 F.3d at 1064, the Convention "establishes a strong presumption favoring return of a wrongfully removed child." *da Silva v. de Aredes*, 953 F.3d 67, 72 (1st Cir. 2020) (citations omitted).

### B.    The Parties' Stipulations

Typically, the party seeking the return of a child (the petitioner) bears an initial burden of demonstrating the habitual residence of the child and that the petitioner was exercising their

- 12 -

custody rights over the children as per the country's laws at the time of the alleged wrongful abduction.  22 U.S.C. § 9003(e)(1); *Friedrich*, 78 F.3d at 1064.  Here, the parties stipulated that Thailand is the habitual residence of M.P. and Z.P.  (Doc. 28).  They further stipulated to Petitioner's custodial rights and agreed that she had been exercising those rights at the time Respondent removed the children from Thailand.  (Doc. 75, PageID: 1585).

Therefore, the Court holds that Respondent wrongfully removed his children from Thailand in contravention of the Convention.

## C.    Credibility of Witnesses

Before assessing Respondent's defense to his wrongful removal, it is critical that the Court address the credibility of the parties.  The assessment of the evidence relating to grave risk depends significantly on the credibility of the witnesses.  *Luis Ischiu v. Gomez Garcia*, 274 F. Supp. 3d 339, 351 (D. Md. 2017).

Without a doubt, Respondent cares deeply for his children.  He was emotional when he testified and spoke to Petitioner on the phone about the girls' safety.  But the Court finds that his emotions may have clouded his investigation.  From the first allegation, Respondent chose not to be completely forthcoming to Petitioner.  Instead of working through serious allegations in mid-August, he chose to threaten the mother of his children and subject the children to multiple visits with multiple doctors.  Moreover, as discussed more below, Respondent's abuse allegations morphed over time.

Additionally, the Court does not find Petitioner as disinterested in her children's safety as Respondent portrayed.  As soon as Petitioner learned of the appointment with Dr. Anjana and the concern of abuse, she rearranged her schedule and followed-up with Dr. Anjana in person.

However, this does not mean the Court found Petitioner completely credible. The events in February 2019 and her stay at the hotel demonstrate her ability to conceal the truth, especially regarding Hardy. Throughout Respondent's investigation, Petitioner repeatedly downplayed the possibility of Hardy's involvement.

Even though Petitioner seemed less-than forthcoming regarding her relationship with Hardy, there is no reason to believe she would deliberately expose her children to harm. Respondent himself suggested Petitioner is a good mother. The Court believes that Petitioner is not completely aloof to the various threats to her children's safety and would take adequate measures to protect them.

In its decision, the Court relied heavily on what was contained within the medical records of the children. Both parties presented evidence not contained within the records, like what Dr. Anjana allegedly told both of them. Given the credibility concerns of each parent, the Court relied solely on the medical record when conflicting "extra" evidence was presented.

Finally, the Court found Dr. Farshid Afsarifard credible. He thoroughly explained his investigation and his conclusion. He was truthful when presented with evidence he had not previously considered and provided appropriate responses in light of new facts.

**D.      Article 13 – Grave Risk of Harm or Intolerable Situation Exception[14]**

Respondent justifies the abduction of his children in order to prevent a "grave risk…of physical or psychological harm or…an intolerable situation." Convention, art. 13(b). "[A] child's return is not in order if the return would place her at a 'grave risk' of harm or otherwise in 'an intolerable situation.'" *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020). The respondent

---

[14] Respondent's Answer asserted two additional defenses: 1) that the children objected to returning to Thailand; and 2) that the children's return would violate public policy under Article 20 of the Convention. Respondent abandoned these defenses at Trial, focusing solely on the grave risk exception under Article 13(b) of the Convention.

bears the burden to prove the grave risk by 'clear and convincing evidence.'  22 U.S.C. §

9003(e)(2)(A); *Friedrich*, 78 F.3d at 1067; *da Silva*, 953 F.3d at 73 (The clear and convincing

standard "requires the factfinder to have an abiding conviction that the truth of its factual

contentions are highly probable").

 The grave risk exception is "narrowly drawn."  *Asvesta v. Petroutsas*, 580 F.3d 1000,

1020 (9th Cir. 2009).  And the risk to the children must be grave, not merely serious.  *Friedrich*,

78 F.3d at 1068; *see also Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013) (For grave risk,

"[t]he potential harm to the child must be severe, and the level of risk and danger required to

trigger this exception has consistently been held to be very high").

 Accordingly, "the grave risk threshold is necessarily a high one," but not insurmountable.

*Simcox v. Simcox*, 511 F.3d 594, 608 (6th Cir. 2007).  Relevant factors for determining whether a

grave risk exists include i) the nature and frequency of the abuse; and ii) the likelihood of

reoccurrence.  *Id.* at 607-08.

 Respondent argues Hardy presents a grave risk of harm to the children.  And since

Petitioner does not acknowledge this grave risk, the children would be placed in an intolerable

situation if returned to Thailand.  Petitioner disagrees with Respondent's factual basis of his

claim.  Further, even assuming the events occurred as Respondent alleges, he has not satisfied his

burden by proving his defense with clear and convincing evidence.

 The Court agrees with Petitioner.  The crux of Respondent's claims stem from the events

of August 2019.  However, a large issue with Respondent's allegations is how they changed over

time.  For example, the initial allegation was that Hardy touched the girls, both on the arm and

on the inner thigh.  However, Respondent's last reported allegation, to Dr. Afsarifard, alleges

that Hardy put his hand down M.P.'s pants and made M.P. cry.  The morphing of Respondent's

allegations are difficult to pin down.  This is especially true as he oscillates between allegations of sexual abuse, physical abuse and mental abuse.

Certainly, sexual abuse constitutes a grave risk of physical or psychological harm. *Gonzalez v. Pena*, 194 F. Supp. 3d 897, 902 (D. Ariz. 2016); *Guerrero v. Oliveros*, 119 F. Supp. 3d 894, 911 (E.D. Ill. 2015).  And when that sexual abuse occurs at the hands of a custodial parent, the Convention assumes an intolerable situation is created and the child may not be returned.  *Friedrich*, 78 F.3d at 1069 (citing Hague International Child Abduction Convention, Text and Legal Analysis, 51 FR 10494, 10510 (Mar. 26, 1986)).  Here, there is no evidence that Petitioner ever sexually abused her children.  Furthermore, the evidence is thin that Hardy ever sexually abused the children.[15]  All the medical evidence reflects that no penetration occurred and that the sexual organs are fully intact.  While Respondent is correct that "penetration is…not a prerequisite to a finding of sexual abuse posing a grave risk of harm to a child," *Danaipour v. McLarey*, 286 F.3d 1, 16 (1st Cir. 2002), Respondent has not presented any evidence whatsoever of other sexual stimulation or gratification.

Perhaps this is why Respondent moved away from his claim of sexual abuse, turning it into one of general physical abuse.[16]  A "sustained pattern of physical abuse" can satisfy the grave risk of harm defense.  *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014); *Porretti v. Baez*, 2019 WL 5587151, *9 (E.D.N.Y. Oct. 30, 2019); *see also Friedrich*, 78 F.3d at 1069 ("there is a grave risk of harm in cases of serious abuse").  The Court is not clearly convinced that a

---

[15] As discussed, Respondent's attempt to equate past allegations of Hardy's sexual abuse of his adult patients and staff the with sexual assault of the children is improper.  *See supra* n. 4.  The Court will not consider Hardy's past behavior to mean he acted in a similar way with the children.  Also, Respondent did not present any expert report or evidence that sexually abusing adult women increases any probability that Hardy would sexually abuse children.

[16] In his phone conversation with Petitioner on September 7, 2019, Respondent stated that "we're not talking about that kind of abuse" when presented with the fact that no penetration occurred.

'sustained pattern of physical abuse' occurred between Hardy and the children.  While it is difficult to pin down, the August allegations contain one—two at most—instance of abuse.[17] Moreover, the August events resulted in the bruising of one child, even though the alleged abuse was directed at both children.  In fact, all of Z.P.'s medical records reflect normal findings.

Respondent also argued that the children would experience psychological harm by Petitioner's continued denials of Hardy assault on the children.  Grave risk of harm may be found based on the quantity and severity of psychological abuse that children are exposed to. *See Sabogal v. Velarde*, 106 F. Supp. 3d 689, 707 (D. Md. 2015).  The Court agrees with Dr. Afsarifard—when a parent denies the existence of child abuse, psychological harm can result. But Dr. Afsarifard also testified that false allegations of child abuse can cause psychological harm.  And, while not recorded in his medical report, Dr. Paitoon did testify that his concerns of mental attack stemmed from Respondent's behavior, not Hardy's.  In this instance, where the evidence of abuse is equivocal at best, the Court does not find Petitioner's denial of abuse either a grave risk of psychological harm or present an otherwise intolerable situation to the children.

In the end, it is possible that the events of August 2019 occurred just as both parties claim.  It is possible that M.P. fell from a playhouse, which resulted in leg pain.  It is possible that Hardy applied ice to quell the pain.  And it is possible that M.P., a child of 5 years old at the time, reacted negatively to the ice and believed that Hardy had exacerbated her pain.  So, when M.P. reported to Respondent that Hardy touched her and hurt her, she could have been referring to the application of ice.  The existence of the possibility reflects Respondent has not clearly convinced the Court that Hardy assaulted the children.

---

[17] Respondent also alleges that Hardy is a physically abusive person, as told by his wife Umy.  Umy claimed Hardy was abusive to her, her kids and friends of her kids.  The Court does not find Umy credible based on her deposition. From the transcript, it appears that Umy is taking the opportunity to further her divorce case against Hardy.

Beyond the difficulty of proving Hardy assaulted the children by clear and convincing evidence, Respondent faces a further hurdle of proving that Hardy will continue to harm the children upon their return to Thailand.  "The grave risk involves not only the magnitude of the potential harm but also the *probability that the harm will materialize*."  *Souratgar*, 720 F.3d at 103 (emphasis added).

While the Court does not find Petitioner particularly credible regarding her past relationship with Hardy, the Court does believe Petitioner about her current living arrangements. Petitioner testified that she left Chiang Mai and is now living in Saraburi.  If the girls returned to Thailand, they would attend school in Saraburi.  Saraburi is where Petitioner's family lives. Saraburi is where Petitioner conducts her business.  And it was under Respondent's prompting that the family left Saraburi in the first place.

Respondent has not produced any evidence to counter the fact that Petitioner now lives in Saraburi, other than the fact Petitioner still has property in Chiang Mai.  Respondent has not produced evidence of Hardy's presence in Saraburi.  With the children residing in Saraburi upon their return to Thailand, the Court finds additional support in holding Hardy does not present a grave risk of harm to the children.

Respondent compares this case of abuse to the one in *Gonzalez v. Pena*.  In *Gonzalez*, a 10-year old child told her father that she had been sexually abused by her mother's live-in boyfriend.  194 F. Supp. 3d 897, 899.  The daughter also told two other adults about the abuse— a child services investigator and a psychologist.  *Id.* at 900.  All her allegations were consistent. *Id.*  The psychologist testified the daughter suffered from post-traumatic stress disorder.  *Id.*  She even told her mother, although she ultimately recanted and her mother did not believe her.  *Id.*

Given this evidence, the *Gonzalez* court found that the evidence clearly and convincingly established that the live-in boyfriend sexually abused the daughter at least once.  *Id.* at 902.

This case differs from *Gonzalez* in three important respects.  First, Hardy does not live with Petitioner.  The existence of any romantic relationship between the two is questionable.  Moreover, Petitioner does not live near Hardy and will not send her children back to the same school where Hardy sends his children.

Second, the children here only disclosed their allegations of abuse to Respondent.  Dr. Anjana's written records contain no reference to Hardy.  Dr. Paitoon's records reflect i) what Respondent told him what happened and ii) that M.P. was afraid of Hardy.  Dr. Paitoon's diagnosis presumes mental abuse.  But, during his testimony in Thailand, Dr. Paitoon corroborated Petitioner's claim of how the bruise originated (a fall during playtime) and that the mental abuse stemmed from Respondent's treatment of the children.

Dr. Buttabote's records are the only source the corroborates Respondent's allegations. But even then, the records are based on "[Respondent] observ[ing] that the child had a bruise and suspicion that the child's behavior has changed."  Dr. Buttabote ultimately found no psychiatric disorder and ordered no further treatment.  The vagueness and uncertainty of the allegations here are drastically different than in *Gonzalez*.

Third, expert testimony in *Gonzalez* confirmed that the daughter suffered from PTSD. *Gonzalez*, 194 F. Supp. 3d at 902.  There is no such finding here.  Neither M.P. nor Z.P. reported being hurt by anyone to Dr. Afsarifard.  Dr. Afsarifard made no finding of any negative impact on the girls' psyches.  Thus, Respondent's comparison of this case to *Gonzalez* is unfounded.

Respondent's expert summarized this case aptly when he classified it as an "equivocal situation."  To Dr. Afsarifard, an "equivocal situation" is one where "there is some evidence for

and some evidence that doesn't support the allegations" of abuse.  The Court finds the same.

And since this is an 'equivocal situation,' the Court holds that Respondent has not satisfied his

burden to prove a grave risk of harm or an intolerable situation by clear and convincing

evidence.

**F.      Attorney's Fees**

Since the Court is ordering the return of the children to Thailand, Petitioner may be

entitled to certain costs.  Under ICARA, a court "shall order the respondent to pay necessary

expenses incurred by or on behalf of the petitioner, including court costs, legal fees…and

transportation costs related to the return of the child[ren]."  22 U.S.C. § 9007(b)(3).  A

respondent does have the opportunity to establish that such costs "would be clearly

inappropriate."  *Id.*

Accordingly, Petitioner shall submit her brief and supporting materials on costs no later

than January 21, 2021.  Respondent may file an opposition no later than February 5, 2021.

Based on the parties' briefs, the Court will determine if a hearing is required.

### III. Conclusion

Any allegation of child abuse is serious and deserves to be properly vetted.  However, it

is the policy of the Convention and the United States to favor the return of children to their

habitual residences absent the most serious and well-documented instances of abuse.  Here, in

this "equivocal case" of child abuse, that standard has not been met.  Respondent has not clearly

convinced the Court that the children face either a grave risk of harm or an intolerable situation if

they returned to Thailand.

Therefore, the Court **GRANTS** Petitioner's Petition for Return and **ORDERS** the following:

- The Clerk of Courts shall immediately release the children's passports to counsel for Petitioner, Mr. John Sayre;

- Within fourteen days, the parties shall provide the Court with a proposed return plan for the children.  If they cannot come to an agreement, the parties shall notify the Court and the Court will enter its own Return Order accordingly;

- All prior orders, including the Order restricting Respondent's travel with the children to the Northern District of Ohio, shall remain in effect; and

- The parties shall brief the issue of costs as detailed in this Order.

**IT IS SO ORDERED.**

> **s/ Christopher A. Boyko**
> **CHRISTOPHER A. BOYKO**
> **Senior United States District Judge**

**Dated: December 22, 2020**